Filed 7/27/15  P. v. Holley CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>  v.<br><br>DEANGELO LAMAR HOLLEY,<br><br>      Defendant and Appellant. | C073773<br><br>(Super. Ct. No. 11F05963) |

Defendant DeAngelo Lamar "Manny" Holley appeals from a judgment of conviction following a jury trial.  Defendant was convicted of attempted murder without premeditation (Pen. Code, §§ 187, subd. (a), 664)[1] and discharging a firearm at an inhabited house. (§ 246.)  The jury also found true enhancements on both counts for personally discharging a firearm causing great bodily injury (§ 12022.53, subd. (d)) and personally and intentionally discharging a firearm (§ 12022.53, subd. (c)), and that he committed both offenses for the benefit of, at the direction of, or in association with the Gunz-Up criminal street gang.  (§ 186.22, subd. (b)(1).)

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

At trial, both the People and defense counsel offered into evidence posts defendant made to his Facebook account. On appeal, defendant contends that: (1) the trial court erred in admitting into evidence highly prejudicial bad character evidence in the form of these Facebook posts; (2) the prosecutor committed misconduct in cross-examining him by deliberately eliciting impermissible bad character evidence and by use of racially offensive language from the Facebook posts; (3) he was denied his right to the effective assistance of counsel by defense counsel's failure to object to the admission of the bad character evidence, failure to request a limiting instruction as to that evidence, and failure to object to the prosecutor's misconduct; and (4) the trial court imposed an unauthorized sentence of seven years to life on count one since the allegation that the attempted murder was willful, deliberate, and premeditated was found not true.

We conclude that defendant's arguments regarding the trial court's admission of the challenged evidence and prosecutorial misconduct have been forfeited because they were not raised before the trial court. We further conclude that defendant has failed to show that he received constitutionally ineffective assistance of counsel. We agree with defendant that the sentence imposed on count one was unauthorized, an error which the trial court has since corrected.

We affirm the judgment as modified by the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

### The Prosecution's Case

### Gang Affiliation and the Battery on Defendant's Sister

Detective Scott MacLafferty testified as both the lead detective in the case and as an expert on African-American criminal street gangs in Sacramento. MacLafferty opined that defendant was a member of the Gunz-Up criminal street gang. MacLafferty based his opinion on defendant's own statements, the fact that defendant's brother Deandre Duckett was a Gunz-Up member, and prior police contacts with defendant and other Gunz-Up members. On cross-examination, MacLafferty conceded that defendant had no

2

gang tattoos, that he had not seen any school records indicating gang involvement by defendant, and that law enforcement officers had never validated defendant as a gang member.

MacLafferty testified that Keon Jackson (Keon) and Earl "EJ" Jackson (EJ), who were brothers, were members of the Guttah Boyz street gang, a rival of Gunz-Up. Law enforcement officers had validated Keon as a Guttah Boyz member. Keon testified that he "claim[ed]" Guttah Boyz. EJ had acknowledged that he was affiliated with the Guttah Boyz, had repeatedly mentioned his affiliation with the Guttah Boyz on Facebook and other online forums, and appeared in photographs making Guttah Boyz hand gestures.

Keon was dating defendant's sister, Anjonnai Holley. On August 20, 2011, Anjonnai was at Keon's house. At approximately noon, she had an argument with Cory Lacy, Keon and EJ's cousin. According to MacLafferty, Lacy was "associated to Guttah." In a police interview, EJ stated that during the argument, Anjonnai said, " 'Fuck, where we from we'll do whatever,' " and " 'Guns up.' "[2] Anjonnai also said to Lacy, " 'Fuck your brother . . . I don't care if he get killed.' " Lacy responded, "Guns down," which constitutes an insult or threat to Gunz-Up members, and he punched Anjonnai in the face.

Keon and Melisha Estes, another cousin of Keon and EJ, entered the room and found Anjonnai crying and bleeding from her nose or mouth. Keon told her to go home because she was making a scene and "talkin' reckless." According to a statement EJ gave to one of the first police officers on the scene, as Anjonnai left, she said something like, "I'm gonna go get my brothers to come after you . . . ."[3] However, in his interview with

---

[2] An audio recording of this interview was admitted into evidence and played for the jury.

[3] This statement was made by EJ to the officer "almost immediately" after the officer arrived on the scene at 2:11 p.m.

MacLafferty, when asked if Anjonnai had said she was going to get her brothers, EJ responded, "Not really."

Anjonnai and Lacy continued to yell at each other. Estes asked Kendra Dawson to drive Anjonnai home. Estes testified that Anjonnai "was just upset, so I was grabbing her and getting her in the car." Estes, who rode in the car with Anjonnai and Dawson, testified, "I was telling her . . . it was wrong. I told her that Keon was wrong for not . . . sticking up for her. . . . [¶] . . . [S]he was crying and . . . we was trying to calm her down." Estes testified that Anjonnai said she was going to tell her brothers about being punched, but would not tell them to go to Keon's house. Estes denied that Anjonnai said she was going to have her brothers go to Keon and EJ's house, explaining, "we wouldn't have continued on taking her home."

Dawson testified she was asked to take Anjonnai home. Anjonnai was already sitting in the car waiting to leave when Dawson came out. Dawson, who had been sleeping, said she did not know what had happened before Anjonnai got in the car. Anjonnai did not discuss with Dawson getting her brothers to come back and get someone; she was sad, crying, and quiet. Dawson and Estes dropped Anjonnai off at home.

**The Shooting and the Investigation**

Within an hour after Dawson and Estes returned from driving Anjonnai home, they were standing in front of the house with Keon and EJ when a young African-American male with a white T-shirt covering his face approached them, carrying a shotgun. He pointed the shotgun at Keon and fired it once, hitting Keon. The shotgun blast struck Keon in the head, neck, and bicep. The shooter left quickly on foot. Shortly thereafter, a witness observed a gold-colored car driving rapidly away.

Police arrived at the scene shortly after 2:00 p.m., minutes after the shooting was reported. An ambulance took Keon to the hospital.

4

Some time after the shooting, Keon sent a text message to "[a]n old partner, an old friend," "E Wally." In the text message, Keon said, "Dis da nigga that shot me," and attached defendant's photo. At trial, Keon testified he could not remember anything about the shooter's appearance except for a T-shirt covering his face. Keon testified he sent the text message because he was angry, and other people had told him defendant was the shooter.

On the afternoon of the shooting, police saw a gold-colored Oldsmobile parked in defendant's driveway. The car belonged to Janesha Hemstead,[4] who has a child with defendant's brother Deandre Duckett.

EJ told Officer Magny that a T-shirt covered the shooter's face except for his eyes. However, EJ identified defendant as the shooter, telling Magny that he knew it was defendant based on the shooter's "mannerisms, skin tone, the way he looked, the way he walked, everything about him." EJ said defendant's "face was covered up, but it was him." This statement was made by EJ to the officer almost immediately after the officer arrived on the scene at 2:11 p.m.

In a later interview, -- this one audio recorded -- MacLafferty showed EJ a photograph of defendant, and EJ identified him as the shooter.[5] Unlike his statement on the day of the shooting, EJ said he briefly saw defendant's face, telling MacLafferty that, as "soon as he hit the corner his mask fell off his face."

The day after the shooting, EJ sent a Facebook message to a friend saying the shooter was "[t]his bitch nigga named Manny." Defendant was also known as Manny. Two days after the shooting, exchanging Facebook messages with another friend, EJ

---

**4** Also spelled "Jonesha" in the reporter's transcript.

**5** The recording of this interview was admitted into evidence and played for the jury. A transcript was distributed to the jurors.

referred to "this bitch" getting punched, and stated, "she said she was goin' to have her brother come over here, and they did."

At trial, EJ testified that he did not remember anything at all about the day of the shooting, who shot Keon, or what he told police. He testified that he did not recall making any of the statements on the audio recordings, and even denied that the voice on the audio recordings was his. When asked whether the person answering questions on the audio recording was being a "snitch," EJ testified that he did not know what the word snitch meant. However, in September 2011, EJ exchanged private Facebook messages with a friend about an apparently unrelated matter, in which he said, "Because a snitch me? Never. [¶] . . . [¶] For real, snitches really get killed faster than anyone else."

The day of the shooting, Estes described the shooter to Officer Malott as a skinny African-American male, 16 to 17 years old, approximately 5'8" tall, with big eyes. A white T-shirt covered much of the shooter's face. Estes told Malott that defendant was the shooter, and that he was a Gunz-Up member.

Several days after the shooting, MacLafferty showed Estes a photo lineup with photographs of defendant and five other individuals who fit the description witnesses had given of the shooter. Prior to displaying the lineup, MacLafferty used a Sharpie marker to color in portions of the photographs, obscuring the parts of the individuals' faces which would have been covered by the white shirt worn over the shooter's face. Estes initially said none of the individuals in the photos could be the shooter because the shooter didn't have hair, whereas the men in the photos all had dreadlocks or hair sticking up. MacLafferty told Estes to ignore the hair, and she then selected the photograph of defendant.

At trial, Estes testified to the same description of the shooter, and agreed that defendant matched the description. However, she testified that she was not certain defendant was the shooter. She testified that, on the day of the shooting, she identified defendant because she was familiar with him, the shooter and defendant had similar

6

builds, there were already tensions between defendant and Keon, Anjonnai had been hit earlier that day, and Estes heard her relatives saying that the shooter must have been one of Anjonnai's brothers.[6]

### Additional Gang Evidence

Detective MacLafferty testified that G-Mobb is a South Sacramento African-American street gang. Subsets of G-Mobb included Guttah Boyz and Starz or Starz-Up, although Starz has grown so big as to now constitute its own gang. Guttah Boyz consisted of a number of younger individuals, 14 to 16 years old, who took on this name, and were, in many cases, younger brothers of G-Mobb or Starz members. G-Mobb, Starz, and Guttah Boyz shared common enemies. Oak Park Bloods, a Blood-based rival gang to G-Mobb, had subsets including Fourth Avenue Bloods or Fuck a Bitch, also known as FAB, and Zilla or Ridezilla. Gunz-Up started when some individuals broke off from Starz, and eventually became aligned with FAB.

MacLafferty testified that, for a gang member, a gun is a status symbol. He continued, "that gun benefits them as a gang member because it gives them status, it gives them respect within their clique, within their gang. And it can be used as a sign of intimidation to other gangs. And other people, not only gangs but . . . people in the community . . . ." MacLafferty testified that, in gang culture, everybody "constantly has to be looking over their shoulder . . . worrying about if they are going to get -- it's called getting caught slippin', that's without being with more of your partners and/or not having a gun yourself, and you get caught by other folks on that, that's a constant worry."

MacLafferty testified, "Gang members don't view respect like you and I would. . . . [¶] Gang members['] respect or disrespect is based on fear and intimidation. And

---

[6] Estes testified that she was together with Dawson and EJ when she gave her statement to Officer Malott. Malott testified that he separated Estes from the others when she took her statement. Dawson testified that the police "separated everybody" before taking their statements.

forcing the other side to respect you based on that fear and intimidation which often involves violence. [¶] So, a lot of those cases, motive wise are based on that fear and intimidation." Asked about circumstances mirroring those at issue here, MacLafferty testified that "it could be that if one sister was assaulted by a rival gang member, could be viewed as one of those disrespect things. And therefore requiring a response." MacLafferty continued, "if you don't respond to that level or form of disrespect . . . for one thing the rival gangs are going to look at you as what they call soft or what they call a punk. [¶] But your clique or your gang says okay, you were disrespected . . . , what are you going to do about it. So you will be seen at it on both sides."

Detective MacLafferty testified that gangs label people who speak to police or testify against gang members as "snitches." People who cooperate with police may be threatened or assaulted. Gang members are opposed not only to rival gang members testifying against them, but also to their own members testifying against rivals. It would not surprise MacLafferty if a person who made an earlier statement to the police denies having made that statement during courtroom testimony and he has seen it happen.

MacLafferty said that gang members sometimes have multiple motives for committing shootings. Here, the incident involving defendant's sister cannot be separated out from the gang motivation because the motives are intertwined. MacLafferty testified that "Marquice Wallace, who was Keon and [EJ's] brother, killed Marque Johnson who is [defendant's] friend and then contacted with him here." MacLafferty testified that he interviewed defendant in connection with that investigation and defendant told him that Gunz-Up has a "funk with Starz."[7] MacLafferty opined that there was both a gang and very strong personal reason involving defendant's sister for

---

[7] MacLafferty also testified that the earlier shooting followed a shooting that occurred five days before which involved some of the same individuals. He also said that defendant was shot by Starz gang members in 2009.

8

this shooting. Lacy, the person who assaulted defendant's sister, is a member of Guttah and his assault was a reaction to her disrespecting his gang by saying, "Gunz-Up." And Gunz-Up was disrespected when defendant's sister was assaulted.

MacLafferty was of the opinion that this shooting was committed for the benefit of the Gunz-Up criminal street gang.

**Cell Phone Evidence**

The prosecution presented evidence of defendant's cell phone use before and after the shooting. Prior to the shooting, between 1:00 and 1:30 p.m., there were a series of calls between defendant's cell phone and those of Anjonnai and Duckett. At 1:30 p.m., defendant called his friend Javonte Brown. At 1:41 p.m., a text message was sent from defendant's cell phone. Then, for over 20 minutes, there was no outbound activity on defendant's phone. At 2:04 p.m., six minutes after the shooting was reported to police, defendant sent a text message. At 2:06 p.m., defendant received a call that was routed to voicemail, at which time his cell phone was connected to a cell tower approximately 2.65 miles from Keon's house. At 2:11 p.m., defendant received a phone call from Brown which lasted 53 seconds. Between 2:12 and 2:58 p.m., defendant's cell phone was connected to a series of cell towers, indicating that defendant was traveling. At 2:58 p.m., defendant's cell phone was connected to a tower approximately one-half mile from his home. The parties stipulated that the distance from Keon's house to defendant's house was between 7.0 and 7.8 miles.

**Defendant's Facebook Posts**

During the investigation, EJ and Estes brought to Detective MacLafferty's attention certain posts by defendant to his Facebook account which they felt were related to the shooting. Estes testified that these posts were a reason she had believed defendant to be the assailant. MacLafferty obtained a warrant for defendant's Facebook information for the time period from August 20 to August 25, 2011.

9

During its case-in-chief, the prosecution presented two of defendant's Facebook posts. In one, defendant wrote, "U heard I got that chop, tho, while I'm knockin'at your front door. Bullet to your skull, ma, your brains looks like gumbo." Detective MacLafferty testified that "chop" is slang for a sawed-off shotgun, and that "chopper" is slang for an automatic rifle.

In the other Facebook post introduced during the prosecution's case-in-chief, defendant stated, "I gave 'em two to the head, I only knocked twice, hit 'em with the antifreeze at the stoplight. No need for a watch in the fast . . . life."

MacLafferty testified, "These are two that the witnesses felt were relevant to the incident of Keon getting shot. They brought them to my attention. And the correlation between him getting shot . . . , the shooting to the head, turn your brains like gumbo. He got shot in the head."

On cross-examination, defense counsel asked MacLafferty how he reconciled the inconsistencies between the second Facebook post and the facts that Keon was only shot once, and not at a stoplight. MacLafferty responded, "I don't."

Defense counsel introduced two more of defendant's Facebook posts while cross-examining MacLafferty. On August 21, 2011, defendant posted, "Honey bun drum in the thang about as tall as me, antifreeze issue, you suckas can get it for free." On August 22, 2011, defendant posted: "Like a scarecrow way niggas scare for, are with the airholes, leave a nigga with airholes, I'm hopping out the Vans but not the shoes 'cause I don't wear those." Defense counsel asked MacLafferty if he had "an opportunity to look at . . . a broader view" of defendant's Facebook posts beyond the days encompassed by the search warrant "to see if these posts were in fact unusual." MacLafferty had not. MacLafferty also acknowledged that defendant told him that the posts were rap lyrics.

10

## Defendant's Case

### Defendant's Testimony

Defendant testified that he spent the night before the shooting at the house of Brandi Edd, his brother's girlfriend. Rakeem Collins and his girlfriend were also there. Defendant testified that he walked home from Edd's house at approximately 1:00 or 2:00 on the afternoon of the shooting.

At 3:04 and 3:26 p.m., defendant exchanged text messages with his friend Javonte Brown, indicating that he was about to pick Brown up. Later, defendant went with Hemstead to pick up Brown, and then they returned to defendant's house. Defendant, Brown, and Anjonnai walked to a 7-Eleven store, and, when they returned, police were at defendant's house.

Asked if he knew exactly where he was at the time the shooting occurred, defendant replied, "I think I was at Brandi's house but I really don't know. Probably at home. I don't remember." He also testified that, at the time of the shooting, "I was at my house but I didn't really know what time it was so I don't know if I was, but I feel I was at my house . . . ."

Defendant testified that, when he spoke on the phone with Anjonnai and Duckett before the shooting, there was no discussion about Lacy punching her. Anjonnai was simply trying to get a ride home. Defendant did not learn that Anjonnai had been punched until sometime after he arrived at home on the afternoon of the shooting.

Defendant acknowledged that, in an interview on August 25, 2011, he told MacLafferty that he was at Priscilla Williams's house the day of the shooting. However, at trial, he admitted that was a lie.

During the interview, defendant told MacLafferty that he only wears bright clothing. However, defendant acknowledged that MacLafferty had not said anything about what the shooter was wearing. Defendant testified that he did not know the shooter was described as wearing dark clothing. He explained, "I feel that if somebody were able

11

to describe me or anything, they would say that I have bright clothing on because that's all I have is bright clothes." The prosecutor on cross-examination continued,

"Q    So you just volunteered that bright clothing comment out of nowhere?

"A    Yes.

"Q    Just because?

"A    Yes."

Defendant had also mentioned to MacLafferty during the interview that the shooter's face was covered with a white T-shirt, although MacLafferty had not mentioned this detail either. Defendant testified that he learned of this description on EJ's Facebook page, and that EJ "possibly deleted it or he did delete it."[8]

At trial, defendant admitted that, during the interview, he had lied to MacLafferty, explaining that MacLafferty was accusing him of something he did not do. Defendant did not believe he would be arrested, so he "tried to get out of it by saying anything." Defendant also testified that he lied to MacLafferty about his whereabouts on the day of the shooting because he "didn't want to get the people that [he] really [was] with in trouble." The prosecutor asked defendant why, even after MacLafferty indicated defendant would be arrested for the shooting, he did not tell MacLafferty that he had been at Brandi Edd's house as he claimed, since she and the others who were there could have provided him with an alibi. Defendant responded, "because maybe those people wouldn't tell them that, sir. Not everybody wants to talk to the cops."

---

[8] MacLafferty testified that Facebook had provided him with records of EJ's account activity from the date of the shooting until February 7, 2012, and that the records contained no statements about the shooter covering his face with a white T-shirt. However, he also testified that he could not recall if private messages sent to and from EJ's account referred to a white T-shirt. On cross-examination, MacLafferty conceded that the search warrant did not include a request for deleted material, and it was possible that the information provided by Facebook was incomplete.

12

Defendant subsequently testified that he "decide[s] to lie when [he] feel[s] like lyin'." He further testified, "I'm a kid, I'm going to lie if I feel like lyin,' " and "if I don't want to tell you anything, I'm gonna tell you a lie."

Defendant testified he was not a gang member. He testified he was in the Valley Hi Piru gang from when he was 13 years old, but he left that gang in 2009 or 2010. Defendant testified he had never been a member of Gunz-Up, but he spent time with Gunz-Up members who were friends of his or his brother's. He explained a prior statement he made, testifying that in 2010, he had told police that he, his brother, and another individual were the only Gunz-Up members at a house party where a shooting occurred because that was how rival gang members viewed him, and because his brother and his friend were Gunz-Up members.

When asked by the prosecutor whether he used his phone about every five minutes for placing calls or sending text messages, defendant responded, "Yes." The prosecutor asked defendant why there was no activity on his cell phone from approximately 1:45 p.m. until 2:06 p.m. on the day of the shooting, and defendant responded that, because he uses his phone frequently, it "tends to . . . die," and he has to turn it off and turn it back on some time later.

Defendant testified that the Facebook post which read, "U heard I got that chop, tho, while I'm knockin' at your front door. Bullet to your skull, ma, your brains looks like gumbo," was from a rap that he wrote. He posted it because he "just like[d] raps and violent licks and stuff." Defendant testified that the post had nothing to do with Keon.

With regard to the post which read, "I gave 'em two to the head, I only knocked twice, hit 'em with the antifreeze at the stoplight. No need for a watch in the fast . . . life," defendant testified that it was song lyrics by an artist named HD. Again, defendant testified that the lyric had nothing to do with Keon.

Defense counsel introduced several more Facebook posts during defendant's direct examination. Defendant posted, "I ride wit the lama, I slide with the lama, you don't

13

want no problem, a rockin' like a lama." Defendant testified that this was from a song by Lil Blood.

Defendant posted, "Eat u like a viper. Ima lover not a fighter, but behind close doors we can get it sparkin like a lighter." Defendant testified that this was a rap that he wrote. On cross-examination, defendant agreed that "sparkin like a lighter" was about shooting a gun, and that a lot of lyrics he liked were about guns.

Defendant also posted, ".45 snap ya cap like a can of Sprite. I grip the hammie tight, runnin' from the flashy lights." Defendant testified that this was from a song by HD.

On June 29, 2011, defendant posted, "fresh bounce out the load, no ski masks with a chop in my backpack smack, smack, catch me a slippin at Mc Donald's on the Mack block." Defendant testified that this was another rap he wrote.

On February 22, defendant posted, "I tote two pistols, a 40 and a 9 with me" and "Come take a ride with my Glock." Defendant testified that both of these posts were lyrics by rapper Sleepy D.

Defendant also posted rap lyrics by other artists on Facebook.

On cross-examination, defendant acknowledged an additional Facebook post. This post read, "I'm inseparable from this Glock, emotional about my Glock, she's playin' hard to get, make me chase."

**Verdict and Sentencing**

The jury found defendant guilty of attempted murder and of discharging a firearm at an inhabited house. However, the jury found not true the allegation that the attempted murder was willful, deliberate, and premeditated. The jury found the other enhancements to be true.

For the attempted murder conviction, the court initially sentenced defendant to seven years to life, with a consecutive sentence of 25 years to life for the enhancement pursuant to section 12022.53, subdivision (d). Pursuant to section 654, the court stayed

14

the sentence on the second count.  The court struck the gang enhancements in the interests of justice pursuant to section 186.22, subdivision (g).  The trial court subsequently amended the judgment, sentencing defendant to five years for attempted murder, plus 25 years to life for the section 12022.53, subdivision (d), enhancement.

## DISCUSSION

### I.  Claims Concerning Facebook Posts

Defendant argues that the trial court erred in admitting highly prejudicial bad character evidence in the form of his Facebook postings, depriving him of a fair trial.  He also asserts that the prosecutor committed misconduct in cross-examining him by using racially inflammatory language from his Facebook posts and by emphasizing the improperly admitted bad character evidence.  Defendant further asserts that, because his trial attorney failed to object to the admission of this evidence and to the prosecutor's misconduct, and thus failed to preserve his contentions for appellate review, he was denied the effective assistance of counsel.  Defendant also contends that he was denied the effective assistance of counsel by his attorney's failure to request a limiting instruction as to the Facebook posts.

As defendant acknowledges, he has forfeited his claims concerning the trial court's admission of evidence and prosecutorial misconduct by failing to raise them in the trial court.  We conclude that defendant was not denied the effective assistance of counsel based on the failure to raise these claims in the trial court or based on the failure to request a limiting instruction.

### A.  Forfeiture

"[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.'  [Citations.]  This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights.  [Citations.]"  (*In re Seaton* (2004) 34 Cal.4th 193, 198.)  Specifically with regard to defendant's contention that the judgment should be

15

reversed due to the trial court's erroneous admission of certain evidence, " '[a] judgment will not be reversed on grounds that evidence has been erroneously admitted unless "there appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." (Evid. Code, § 353, subd. (a) . . . .)' " (*People v. Pearson* (2013) 56 Cal.4th 393, 438, italics omitted.) "This gives both parties the opportunity to address the admissibility of the evidence so the trial court can make an informed ruling, and creates a record for appellate review. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, pp. 444–445 ['it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial'].)" (*People v. Davis* (2008) 168 Cal.App.4th 617, 627.)

Likewise, "trial counsel's failure to object in a timely manner to asserted prosecutorial misconduct also results in the forfeiture of the claim on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 757 (*Dykes*), citing *People v. Stanley* (2006) 39 Cal.4th 913, 952.) " ' "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' [Citations.]" (*People v. Tom* (2014) 59 Cal.4th 1210, 1238-1239.)

As noted, defendant concedes that his defense counsel did not object to the trial court's admission of the Facebook posts or to the prosecutor's cross-examination.[9] Indeed, with regard to the admission of evidence, defendant's trial counsel did not merely

---

[9] Objection to prosecutorial misconduct "may be excused if it would have been futile or an admonition would not have cured the harm." (*Dykes*, *supra*, 46 Cal.4th at p. 760, citing *People v. Hill* (1998) 17 Cal.4th 800, 820.) However, defendant does not assert on appeal that objections would have been futile or that admonitions would not have cured the harm.

16

abstain from objecting to the admission of two Facebook posts introduced in the People's case-in-chief; defense counsel expressly requested that "the records be admitted in their entirety" and then offered into evidence two additional Facebook posts during his cross-examination of MacLafferty, and several more posts during the direct examination of defendant.

Based on defendant's failure to object in the trial court to the Facebook posts offered by the prosecution and his own admission into evidence of other Facebook posts, defendant has forfeited his contentions concerning the admission of his Facebook posts and the prosecutor's cross-examination of him regarding that evidence. For the same reasons, defendant has forfeited his claim that the trial court's admission of the challenged evidence violated his right to due process under the Fourteenth Amendment, and rendered his trial fundamentally unfair.

### B. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never . . . easy.' [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, ___ [178 L.Ed.2d 624, 632] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, ___ [176 L.Ed.2d 284, 297].)

The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.] The

17

question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. [Citation.]" (*Richter*, *supra*, 178 L.Ed.2d at pp. 642-643.)

" 'Failure to object rarely constitutes constitutionally ineffective legal representation . . . .' " (*People v. Huggins* (2006) 38 Cal.4th 175, 206, quoting *People v. Boyette* (2002) 29 Cal.4th 381, 424.) "Moreover, '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*Huggins*, at p. 206, quoting *People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069 (*Kraft*).)

### 1. Facebook Posts Introduced by the Prosecution

### a. Deficient Performance

The two Facebook posts challenged by defendant on appeal, which were introduced during the prosecution's case-in-chief, were both relevant and admissible as admissions of guilt. (Evid. Code, § 1220.)

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having *any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) Here, the circumstances of the Facebook posts and similarities between the posts and the circumstances of shooting are such that the posts had a tendency in reason to prove a disputed fact of consequence in this case, specifically defendant's identity as the shooter. Defendant uploaded the two Facebook posts offered by the prosecution in the days immediately following the shooting. One post referred to shooting someone in the head at a front door with a chop, slang for a sawed-off shotgun. This post bears significant similarities to the shooting in this case, where Keon was shot in the head in front of his house with a shotgun. The other post, among other things, includes the statement "I gave 'em two to the head . . . ." Particularly in light of the

timing of the posts and the surrounding circumstances, including the fact that eyewitnesses had identified defendant as the shooter and that the victim was shot in the head, these posts made by defendant to his Facebook account were relevant.

"Admissions that tend to prove the declarant committed a charged offense . . . are not offered as other crimes evidence, and instead are offered simply as statements made by a defendant that in and of themselves tend to prove he committed a charged offense. Such statements are admissible to prove identity of the perpetrator . . . ." (*People v. Robinson* (2000) 85 Cal.App.4th 434, 445 (*Robinson*).)

In *Robinson*, the trial court admitted testimony of a woman who stated that the defendant had told her, while in a car in Oxnard, that, "if something ever happened to her he would get rid of her body by dumping it in Los Angeles." (*Robinson*, *supra*, 85 Cal.App.4th at p. 444.) The defendant made this statement approximately five days after the murder of the female victim, "who was from Oxnard and whose body was 'dumped' in a Dumpster in Los Angeles." (*Ibid.*) The Court of Appeal upheld the admission of the witness's testimony as an admission by the defendant, observing, "[t]he fact that defendant had the circumstances of the murder on his mind only days after committing it, and could not keep himself from talking about the scenario of dumping a woman's body in Los Angeles, is highly relevant and can certainly be viewed as an indirect 'acknowledgment' of the crime." (*Id.* at p. 445.) We conclude that defendant's Facebook posts here were likewise relevant as admissions.

As defendant emphasizes, there are a number of differences between the details of the crime and the content of the Facebook posts. These differences included the number of shots fired, the absence of evidence that the shotgun was sawed-off, the fact that the shooter did not knock on the door (to the extent that this portion of the lyrics was literal), and there was no stoplight at the scene.

We conclude that these distinctions did not render the Facebook posts irrelevant or inadmissible, since the posts had some tendency in reason to establish that defendant was

19

the shooter. (See generally Evid. Code, § 210.) Rather, these differences went to the weight to be accorded to this evidence, not its admissibility. (*People v. Ochoa* (2001) 26 Cal.4th 398, 438 (*Ochoa*), abrogated in part on another ground in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14.) In *Ochoa*, the trial court permitted an expert to testify as to the significance of the defendant's tattoo on his forehead of the number " '187,' " which, according to the expert, corresponded to the Penal Code section proscribing murder. (*Id.* at p. 437.) The defendant had added the tattoo after the charged homicides occurred. (*Ibid.*) The California Supreme Court determined that the trial court properly found that the tattoo constituted an admission of the defendant's conduct, as well as a manifestation of his consciousness of guilt. (*Id.* at p. 438.) Our high court further stated that the ambiguities concerning the tattoo were addressed to "the weight of this evidence, not its admissibility, which does not require complete unambiguity." (*Ibid.*)

Similarly, in *Kraft*, *supra*, 23 Cal.4th 978, the trial court admitted into evidence a handwritten document containing "cryptic entries" which the prosecution characterized as a "coded list of defendant's [murder] victims." (*Id.* at pp. 1032-1033.) The defendant had argued that the list lacked probative value because any connection between the entries on the list and the victims was speculative. (*Ibid.*) The California Supreme Court concluded that the trial court could, in the exercise of its discretion, determine that the list was relevant because it had a tendency in reason to prove a disputed fact of consequence. (*Id.* at p. 1034.) Our high court concluded that the mere fact that the entries were "idiosyncratically coded and required interpretation to be understood by a reader" did not mean that "to ascribe a particular meaning to a given entry necessarily [would be] speculative." (*Id.* at p. 1035.) Our high court further concluded that "[p]resumably the jury accorded no weight to any entry it found did not relate to a charged victim." (*Ibid.*)

As in the foregoing cases, we conclude that the evidence at issue here, the Facebook posts, was relevant and admissible as admissions by defendant, and that any

discrepancies between these statements and the shooting went to the weight to be accorded to the evidence rather than to its admissibility.

The Facebook posts were also admissible as relevant to prove that possession and use of guns were among the primary activities of the Gunz-Up gang and that defendant embraced and was engaged in such activities. Detective MacLafferty testified that the primary activities of Gunz-Up were burglary, assault with a deadly weapon, attempted murder, shooting into an inhabited dwelling, and felony possession of a firearm. The posts describe both possession and use of firearms.

We reject defendant's contention that admission of the Facebook posts should have been precluded pursuant to Evidence Code section 352. Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." As the plain language indicates, "[e]vidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*People v. Holford* (2012) 203 Cal.App.4th 155, 167.) A trial court has "broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

The probative value of the Facebook postings offered by the prosecution was not substantially outweighed by the risk that its introduction would necessitate undue consumption of time, or create substantial danger of undue prejudice to defendant, confuse the issues, or mislead the jury. The content of this evidence was not inflammatory when considered in the context of the charged crimes and the other evidence presented at trial. Thus, we conclude that the evidence was not inadmissible pursuant to Evidence Code section 352. (E.g., *Ochoa*, *supra*, 26 Cal.4th at p. 438 [trial

21

court properly admitted evidence of the defendant's " '187' " tattoo over the defendant's Evidence Code section 352 objection].)

Most of the cases cited by defendant to support his argument that his trial counsel's failure to object to the Facebook posts constituted deficient performance are inapposite because they involved inadmissible evidence of other arrests or crimes. (See *People v. Jackson* (1986) 187 Cal.App.3d 499, 505-507 [failure to move for exclusion of prior felony convictions], disapproved on other grounds in *People v. Mason* (1991) 52 Cal.3d 909, 943, fn. 13; *People v. Guizar* (1986) 180 Cal.App.3d 487, 490-491 [failure to request editing of witness's recorded statement that the defendant had "committed 'some murders before' "]; *People v. Zimmerman* (1980) 102 Cal.App.3d 647, 656 [failure to object to information concerning a prior robbery conviction]; *Atkins v. Attr. Gen. of Alabama* (11th Cir. 1991) 932 F.2d 1430, 1431-1432 [failure to object to introduction of defendant's fingerprint card, which contained information about a prior arrest, and which was inadmissible under Alabama law].) Defendant correctly points out that other crimes evidence is highly prejudicial. (See generally *People v. Ewoldt* (1994) 7 Cal.4th 380, 405, superseded by statute on other grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.) However, as stated above, the evidence at issue here was admissible as defendant's admissions and as evidence pertaining to the gang enhancement allegations. The Facebook posts were not introduced as "other crimes" evidence, but as evidence relevant to the crimes and allegations charged.

Defendant also cites *People v. Stratton* (1988) 205 Cal.App.3d 87 (*Stratton*), in which the defendant was convicted of robbing an ice cream store with a handgun. The conviction was reversed because the defendant's trial counsel failed to object to the introduction of evidence that, when he was arrested approximately two weeks after the robbery, he was found to be in possession of a knife and a deactivated hand grenade. (*Id.* at pp. 92-93.) That evidence "was only tangentially relevant to the case at bench, and its potential for prejudice was great." (*Id.* at p. 93.)

22

Here, because the two Facebook posts were made shortly after the shooting by an individual identified by several witnesses as the shooter, because the circumstances described in the statements resembled the shooting in material respects, and because there was little likelihood that the introduction of these statements would confuse the issues or motivate the jurors to punish defendant for uncharged crimes, they were relevant and their probative value was not substantially outweighed by any potential prejudicial effect.

Defendant's reliance on *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1382-1383 (*McKinney*), superseded by statute as recognized in *Torres v. Barnes* (N.D.Cal. Sept. 18, 2014, No. C 11-1804 SBA) 2014 WL 4652400, *9, is also misplaced. At issue in *McKinney* was evidence that the defendant had possessed a particular knife in the past (a "knife that was indisputably no longer in McKinney's possession" on the date of the crime); that, on occasion, he strapped a knife to his body while wearing camouflage pants; and that he had carved " 'Death is His' " on his closet door. (*McKinney*, at p. 1382.) The Ninth Circuit Court of Appeals concluded that the admission of this evidence so infused the defendant's trial with irrelevant prejudicial evidence as to render it fundamentally unfair. (*Id.* at p. 1386.) That evidence was only relevant to prove character, not opportunity or any other fact of consequence. (*Id.* at pp. 1382-1383.)

Unlike the circumstances in *McKinney*, the Facebook posts were not admitted to prove character or a propensity for violence. Rather, this evidence was relevant to prove facts of consequence, including the extent to which defendant personally acknowledged committing the charged crimes and the gang enhancement. Counsel cannot be faulted for abstaining from making meritless objections. (*People v. Price* (1991) 1 Cal.4th 324, 386-387; see also *Stratton*, *supra*, 205 Cal.App.3d at p. 97.)

This case is also different from *In re Jones* (1996) 13 Cal.4th 552, cited by defendant. In *Jones*, our high court determined that trial counsel was ineffective for failing to move to exclude evidence offered by the prosecution "of petitioner's involvement in a shooting incident that resulted in injury to another individual, unrelated

23

to the present case." (*Id.* at p. 581.)  Our high court observed that "[n]o reasoned tactical basis appears . . . for having allowed the prosecution to introduce" the evidence at issue. (*Ibid.*)  Here, defense counsel could have both declined to object to the admissible Facebook posts offered by the prosecution and offered additional posts as part of a reasonable trial strategy.  As he argued in his closing argument, the other posts, several of which predated the shooting, demonstrated that defendant posted the material not as admissions or evidence of consciousness of guilt, but merely because he posted rap lyrics that interested him, because he "like[d] . . . hard core rap," to "show[] off his . . . rapping skills," and because he wanted to be a rapper.

Thus, we conclude that counsel was not ineffective for failing or declining to object to the introduction of the Facebook posts during the prosecution's case-in-chief or for introducing additional posts.

Defendant also argues that his trial counsel should have requested a limiting instruction with regard to the Facebook posts.  As discussed, the posts were relevant and admissible, inter alia, as an admission connecting him with the charged crimes, to refute defendant's denial that he was a gang member by tending to show his immersion in gang culture, and to show firearms possession and use as one of the primary activities of Gunz-Up members.  Furthermore, from the defense's perspective, the posts were admissible to show that defendant's statements were artistic in nature, and not evidence that he shot Keon.  Thus, it is not clear what direction the instruction defendant advocates would have provided, and defendant does not explain what such a limiting instruction should have said.  We cannot fault trial counsel for not requesting a limiting instruction when appellate counsel has not demonstrated what such a limiting instruction should have said. Additionally, as the People observe, counsel was not ineffective for failing to request a limiting instruction because counsel may have wished to avoid further emphasizing the posts which bore similarity to the shooting.  (*People v. Freeman* (1994) 8 Cal.4th 450, 495 ["Counsel may well not have desired the court to emphasize the evidence, especially

24

since it was obvious for what purpose it was being admitted."]; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 934 [a limiting instruction would have added little to the jury's understanding of the case, and the decision not to request one was a reasonable tactical choice to avoid directing the jury to focus on the evidence that proved the gang-related charges].)  Thus, we conclude that the fact that counsel did not request a limiting instruction does not constitute deficient performance.

### b. Prejudice

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, 178 L.Ed.2d at p. 642.)  Rather, to show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient.  (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)  "The likelihood of a different result must be substantial, not just conceivable." (*Richter*, at p. 647.)

There is no reasonable probability that defendant would have obtained a more favorable result if his trial counsel prevented the prosecution from introducing the Facebook posts or if counsel had requested a limiting instruction.  Multiple witnesses identified defendant as the shooter.  The record contained evidence that defendant had motives to harm Keon.  According to MacLafferty, Keon's brother murdered defendant's friend, a rival gang member.  Additionally, on the day of the shooting, Keon's cousin, a rival gang member, punched defendant's sister at Keon's house.  Keon, also a rival gang member, had been dating defendant's sister and did nothing to protect her from or vindicate the assault, but instead put defendant's sister out of the house.  Given the gang rivalry, the history of retaliation between the gangs, and gang culture of maintaining respect through violence, the motive evidence was compelling.  Defendant's account of

the day of the shooting changed over time, and was largely unsupported by the evidence. There is no reasonable probability that, had defense counsel successfully opposed the introduction of the Facebook posts, defendant would have obtained a more favorable result at trial.

Defendant argues that "[t]he introduction of the highly prejudicial bad character evidence here completely destroyed his credibility in the eyes of the jury." However, the record does not support this contention. Defendant's credibility was undermined by his own admission that he lied to MacLafferty; his account of his actions before and after the shooting, which was contradicted by the cell phone evidence; his denial that he knew at the time of the shooting that his sister had been punched; and his denial that he was a Gunz-Up gang member. Indeed, defendant testified, essentially, that he would lie whenever it suited him. In this context, there is no reasonable probability that the admission of the two Facebook posts in the prosecution's case-in-chief or counsel's failure to request a limiting instruction had any effect on the jury's view of defendant's otherwise questionable credibility.

### 2. Prosecutor's Cross-Examination of Defendant

### a. Deficient Performance

Defendant claims that trial counsel's failure to object to prejudicial cross-examination constituted ineffective assistance of counsel. However, we conclude that, in all but one instance, the prosecutor's cross-examination was not objectionable, and counsel's failure to object did not constitute deficient performance.

There is only one challenged question by the prosecutor during his cross-examination of defendant that was objectionable. In questioning defendant about the lyrics set forth in his various Facebook posts, the following exchange occurred:

"Q    You put the stuff about shooting niggas in the head. Right?

"A    Oh, I didn't say that, but yeah.

"Q    Well something to the affect [*sic*]. Right?

26

"A     Yes."

The trial record does not contain any statement by defendant "about shooting niggas in the head." Defendant did post on Facebook, among other things, "Like a scarecrow way niggas scare for, are with the airholes, leave a nigga with airholes . . . ." He also posted, "Bullet to your skull, ma, yo brains looks like gumbo," and ".45 snap ya cap like a can of Sprite."

A prosecutor's use of a racial slur is generally improper unless it is a direct quote and relevant. The prosecutor's question appears to be an amalgamation of the foregoing posts. Under the circumstances of this case, the failure to object to this isolated lapse does not constitute constitutionally deficient performance.[10]

Contrary to defendant's contention, the other challenged questions during the prosecutor's cross-examination of defendant were not objectionable. As previously discussed, defense counsel may have opted to submit into evidence certain Facebook posts for the legitimate, strategic reason of casting the evidence in a light more favorable to the defense. Having introduced this material into evidence, the defense opened the door to the prosecutor's questions on cross-examination exploring the subject and the contents of the evidence. (*People v. Friend* (2009) 47 Cal.4th 1, 35 ["Because the defense opened the door to the subject by eliciting defendant's prior felony convictions in his direct testimony, the prosecutor properly could raise the issue in cross-examination."].) Contrary to defendant's contention, the prosecutor's questions concerning what he termed defendant's "fascination" with guns did not improperly elicit bad character evidence; rather, the prosecutor's questions were within the proper scope of cross-examination in light of the evidence before the jury (see generally *People v. Letner*

---

[10] We emphasize, however, that the prosecutor should endeavor to be more precise and avoid paraphrasing in referencing such language, particularly when, as here, the exact statement is known.

27

*and Tobin* (2010) 50 Cal.4th 99, 160 [trial court did not abuse its discretion by allowing the prosecutor to question Tobin on a subject that Tobin brought up in his own testimony], citing *People v. Mayfield* (1997) 14 Cal.4th 668, 754 [cross-examination can explore a defendant's testimony in greater detail than the direct testimony, and, in general, the permissible scope of cross-examination is very wide]), and were, as defendant acknowledges, based on the evidence submitted by the defense.

Defendant contends that defense counsel opened up this line of cross-examination by introducing the other Facebook posts. This is true, but as we have said, the introduction of those posts was strategic. There is "no expectation that competent counsel will be a flawless strategist or tactician" (*Richter*, *supra*, 178 L.Ed.2d at p. 646), and counsel's strategy is not constitutionally deficient just because it may not have worked. (*Id.* at p. 645 [defense counsel is not incompetent merely because the defense strategy did not work out as well as counsel had hoped].)

### b. Prejudice

Even were we to assume that the prosecutor's cross-examination was improper, and that defense counsel's failure to object was constitutionally deficient, defendant has failed to establish that he sustained prejudice. Based on the evidence marshaled above, there is no reasonable probability that defendant would have obtained a more favorable result had defense counsel objected to the challenged remarks during the prosecutor's cross-examination of defendant. Moreover, had defense counsel successfully objected to the objectionable question invoking the racial slur, the prosecutor still could have directly quoted defendant's Facebook posts in questioning him on the subject.

### 3. Ineffective Assistance of Counsel Claim - Conclusion

Based on of the foregoing, contrary to defendant's contentions, we conclude that he was not denied the effective assistance of counsel.

## II. Sentencing

The trial court's original sentence of seven years to life on count one was unauthorized. Here, the jury found not true the allegation that the attempted murder was willful, deliberate and premeditated. Therefore, section 664, subdivision (a), authorized only a determinate sentence of five, seven, or nine years.

Since the original sentencing proceeding, the trial court corrected the unauthorized sentence, as it had the authority to do (see generally *People v. Nelms* (2008) 165 Cal.App.4th 1465, 1471-1472), by entering an amended judgment sentencing defendant to five years on the attempted murder count, plus the consecutive 25 to life term for the firearm enhancement. This sentence is authorized.

However, we have noted the amended abstract of judgment erroneously identifies subdivision (a), rather than subdivision (d), of section 12022.53 as supporting the firearm enhancement sentence imposed on count one.[11] Accordingly, a second amended abstract of judgment must be prepared to reflect the correct subdivision supporting this enhancement.

---

[11] The record has been augmented to include a certified copy of the amended abstract of judgment. (Cal. Rules of Court, rule 8.340(a).)

## DISPOSITION

The clerk of the superior court is directed to prepare a second amended abstract of judgment correcting the statutory citation for the count one enhancement to section 12022.53, subdivision (d).  The clerk is directed to forward a certified copy of the second amended abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


       MURRAY       , J.


We concur:


     MAURO      , Acting P. J.


     HOCH      , J.