[No. B130050. Second Dist., Div. Five. Dec. 11, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
COREY ROBINSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts A-E and G-H in the Discussion.

## COUNSEL

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## WEISMAN, J.*—

### I. INTRODUCTION

Defendant Corey Robinson appeals from a judgment of conviction following a jury trial. The jury found him guilty of first degree murder (Pen. Code, § 187, subd. (a); count 1), found true a special circumstance allegation that

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

the murder was committed while defendant was engaged in the commission of rape (Pen. Code, § 190.2, subd. (a)(17)), and also found him guilty of forcible rape (Pen. Code, § 261, subd. (a)(2); count 2). Defendant was sentenced on count 1 to state prison for life without the possibility of parole, and was sentenced on count 2 to a determinate term of eight years in prison, which was to be served before the indeterminate life term in count 1.

Defendant contends on appeal that: (1) his convictions for murder and rape, and the special circumstance of murder during a rape, must be reversed because the evidence was insufficient to show that a rape was committed and that defendant committed the murder; (2) the trial court erred when it instructed the jury in the language of CALJIC Nos. 2.50.01 and 2.50.1 because the instructions allowed the jurors to convict defendant without finding him guilty beyond a reasonable doubt, and because the jurors were told they could find defendant guilty solely on the basis of disposition evidence; (3) the trial court erred when it allowed evidence showing that defendant had raped other women because the probative value of the evidence was substantially outweighed by the possibility it would create an undue prejudicial effect and require an undue consumption of time, and because Evidence Code section 1108 violates due process by allowing such evidence to be used to prove disposition and propensity to commit a charged sexual offense; (4) the trial court erred when it allowed evidence showing that defendant had choked other women since the prejudicial value of the evidence was substantially outweighed by its possible prejudicial effect, and because it was not admissible under Evidence Code section 1101, subdivision (b); (5) the trial court erred when it admitted evidence and argument that the DNA results did not exclude defendant from being the source of the blood found under the fingernail of the murder victim; (6) the trial court erred when it ruled defendant's statement to a woman in Oxnard, made only days after the instant murder, that if he ever wanted to get rid of her body he would "dump" it in Los Angeles, was admissible as an admission in the instant case where the murder victim was from Oxnard and her body was "dumped" in Los Angeles; (7) the prosecutor committed prejudicial misconduct by eliciting evidence of uncharged acts, by misstating the law during argument to shift the burden of proof and to vitiate the presumption of innocence, by asserting in argument factual matters not supported by the evidence, by misstating the evidence in argument, by misusing prior choking incidents as disposition evidence, by attacking the integrity of defense counsel during argument by informing the jury that they could consider the fact the defense expert was being compensated for his testimony, and by appealing to the jury's sympathy for the murder victim and her family; and (8) the cumulative effect of the errors deprived him of a fair trial. We reject each of these contentions and affirm the judgment of conviction.

## II. FACTUAL SUMMARY[1]

In April of 1996, Gloria De La Cruz was 18 years old and lived with her mother in Oxnard. She sang in a band which performed locally. She knew defendant and had gone out with him on April 7, 1996, which was Easter Sunday. On that occasion, defendant picked Gloria up at her residence. Defendant had also called Gloria at home on the telephone on a number of occasions prior to April 23, 1996. After that date, defendant never called the residence again.

On April 20, 1996, Gloria spent the day with her mother. Before her performance at a concert that night, she took a long bath. Her mother accompanied her to the concert and they returned home together later that night. During the next day, April 21, Gloria and her mother spent the day together. On April 21, Gloria took another bubble bath before going to a nightclub in Oxnard to perform at another concert. She was accompanied to the concert by her mother and sister. Gloria then went to perform at another concert that night in Santa Barbara. She then drove home with one of the band members and went to bed around 3:00 a.m. on April 22.

·Gloria woke up about 11:00 a.m. on April 22, and spent the rest of the day at home with her mother. About 10:30 p.m., Gloria went to her room to go to sleep. When her mother woke up the next day on April 23, Gloria was gone. Gloria's mother waited for her to return, and when she had not returned on April 24, her mother and sister started looking for her and also notified the Oxnard Police Department that Gloria was missing. The police told her mother to wait 72 hours because Gloria was 18 years old. On April 29, her mother filed a missing person's report.

On or near the same day she filed the missing person's report, Gloria's mother saw defendant in an elevator. She informed defendant that Gloria was missing, but defendant did not react. Defendant said he would help find Gloria, but he never called after that. Gloria's mother did not find out from the authorities that Gloria was dead until May 10, 1996.

Gloria's lifeless body had been discovered on April 23, 1996, the same day she was noticed missing by her mother. Her body was found in a Dumpster in an alley between Pico Boulevard and Alcott Street in Los Angeles. About 5:00 a.m. on the morning of April 23, a woman who lived by the alley heard a car enter the alley "rather fast." She heard a "screeching" of

---

[1]In accord with the usual rules on appeal, we state the facts in the manner most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

tires, a car door open, and the sound of footsteps on the gravel. She then heard the steel lid of the Dumpster open, and soon after that she heard the lid of the Dumpster slam shut. She then heard the car speed out of the alley.

The police arrived at the scene and secured the area until the homicide detectives arrived. Los Angeles Police Homicide Detective Paul Coulter was one of the first detectives to arrive. He observed Gloria's[2] body inside the Dumpster lying on her right side in a fetal position. Her body was clothed in a blouse and slacks, but had no shoes on. He smelled the odor of gasoline emanating from the Dumpster. He noticed that a fire had been lit in the Dumpster, and an empty book of matches and some charred paper that had been used to light the fire were recovered from the area.

Stephanie Winter-Sermeno, a criminalist working for the Los Angeles County Coroner in the forensic science laboratory, arrived at the scene of the Dumpster about 10:00 a.m. She also detected the odor of gasoline in the area of the Dumpster and observed several charred items. She directed that Gloria's body be removed and taken to the coroner's office for examination. She then conducted an examination of the body at the coroner's office. She determined that the body had been tied in an intricate fashion with a yellow rope, which she characterized as a ligature. The rope was wrapped once around the neck and knotted under the chin. It then extended to the right wrist where it was wrapped twice and knotted. It was then wrapped twice around both knees, and was wrapped once again around the left knee, before being knotted between the right and left legs. She removed the rope and retrieved sexual assault evidence from the body. She also observed a trainee collect scrapings from under Gloria's fingernails. She observed what appeared to be blood in the crotch area of Gloria's underwear, and also what appeared to be blood on her external right labia. She also noticed areas of the body and clothing that appeared to have been singed from being set on fire in the Dumpster. Her shirt had melted from the heat of the fire, and her hair and fingernails were singed and burned.

An autopsy was performed on the body of Gloria De La Cruz on April 24, 1996. The autopsy was performed under the supervision of Dr. Eugene Carpenter, who is a medical examiner employed by the Los Angeles County Coroner's Office. He personally witnessed every lesion on the external portion of the body and every area of damage to the internal portion of the body. In his opinion Gloria De La Cruz died of asphyxia, or lack of oxygen and blood sugar reaching the brain due to the blood vessels of the neck having been compressed by strangulation performed by another person. The

---

[2]The police did not know the identity of the victim at that time, and the victim was designated "Jane Doe number 24" until positive identification was later established.

evidence of manual strangulation by another person's hand or hands included abrasions at the right side of the neck consistent with fingernail marks, deep bruises on the right side of the throat and some bruising on the left side of the throat, and small hemorrhages in the eyes caused by blood congestion in the face and eyes. The strangulation was caused by a person's hand or hands and was not caused by the yellow rope or any other ligature.

Dr. Carpenter also observed severe blunt force trauma to the right front side of the head, just above the area over the left eye, but it did not produce a fracture or brain damage and was not a cause of death, although it was consistent with the type of force that could "knock a person out" and cause unconsciousness. The head injury probably occurred "within the day of death." The pattern of injuries fit the pattern of a "left-handed strangulation process with a battering to the head by the free right hand."

Dr. Carpenter also observed fresh bruises on the front surfaces of both lower legs, abrasions on the body area, and signs of injury to the vulva, but none of these were serious enough to cause death. There were 24 bruises on the lower legs and 3 bruises near the top of the vulva. The bruises on the legs were consistent with the victim raising her legs in an effort to prevent a sexual assault. The nature and pattern of the bruises on the lower legs indicated that they were "defense wounds" and that the legs were drawn up and kept together in an effort to protect the genitalia from attack. In Dr. Carpenter's expert opinion, the bruises on the legs and vulva were significant indicia of sexual assault. The bruises on the vulva were consistent with forcible rape. They were located together in the same area and were in an area where tender skin is over bone and can suffer damage as the male pubic bone hits the female pubic bone. All of the injuries were fresh and it was Dr. Carpenter's opinion that all the injuries occurred during one assault, which was followed by the strangulation which caused death.

Dr. Carpenter also observed 15 to 20 areas where the skin had been injured by burning that were consistent with the body having been burned. None of the burn injuries were a cause of the death and none of the burn damage he observed on the body contributed to the death.

Cocaine metabolite was found in the body of Gloria De La Cruz, which indicated she had ingested cocaine sometime within a day and a half of her death. It was also determined that her blood-alcohol level at the time of death was .06 percent.

Cellmark Diagnostic in Maryland received for testing a vaginal swab taken from the body of Gloria De La Cruz during her autopsy. There was an

insufficient amount of DNA in the sperm fraction of the sample for an "RFLP" DNA test, but an RFLP DNA test was done on the nonsperm fraction of the vaginal swab sample, and the test revealed a banding pattern that matched the pattern in a stain of Gloria's blood, and seven bands of DNA, which matched the banding pattern in a stain of defendant's blood. Defendant therefore could not be excluded as a donor of the vaginal swab sample. The combination of genetic markers that matched in the vaginal swab sample and in the sample of defendant's blood was calculated as occurring only once in 18,000,000 Caucasians, once in 3,100,000 African-Americans,[3] and once in 10,000,000 Western Hispanics.

The Los Angeles Police Department Serology DNA Unit was able to perform "PCR" DNA testing on the sperm[4] fraction of the vaginal swab sample taken from Gloria's body, because a PCR test can be done with much less DNA than that required for an RFLP analysis. Defendant's PCR markers matched those found in the sperm fraction of the vaginal swab, and defendant therefore could not be excluded as the donor of the sperm. The frequency of the PCR profile appearing in the general population was one in every 103,000 people. When broken down by race, the frequency was one in every 96,000 African-Americans, one in every 343,000 Caucasians, one in every 215,000 Hispanics, and one in every 3,800,000 Asians.

The red stain fingernail scraping sample that was taken from underneath Gloria's fingernail was also analyzed. It contained a mixture of DNA from at least two people. One of the people was Gloria, and the other DNA pattern contained the type of markers that were most common and could have included almost anyone as the source of the DNA. Some specific people could be excluded if their markers were inconsistent with some of the markers in the sample. Defendant, however, could not be excluded as a source of the DNA in the fingernail scraping because the markers in the sample were consistent with his DNA markers.

On December 12, 1996, Los Angeles Police Homicide Detective Arthur Placencia went to the residence of defendant's grandmother located in Oxnard. From an alleyway at the rear of that location, he was able to observe some yellow nylon rope leaning against the garage. He photographed the yellow rope and then returned to the location on January 16, 1997, with a search warrant. He again observed the yellow nylon rope in the backyard. A

---

[3]Defendant is African-American.

[4]Sperm can remain in the vaginal cavity for an average of 72 hours, although it has been detected after a period as long as eight to 10 days. If a person took a long bath in hot water the water would cause the sperm to drain from the vagina and would also cause the sperm to decompose. Such a bath would wash away the sperm. Gloria De La Cruz took a long bath on both of the two days that preceded her disappearance.

search of the house at that location took place, and in a back bedroom the police found identification of the defendant and also some photographs that depicted defendant.

Sylvia G. met defendant around Easter, near the end of March, in 1996. She had a boyfriend-girlfriend relationship with him for about two months until June or July of 1996. Their relationship began about two weeks after they met. She bought a car on April 21, 1996.[5] About one or two weeks after she bought the car, she was in the car in Oxnard with defendant and two of his friends. She and defendant had had an argument over a movie. Defendant was very angry and told her that if something happened to her he would get rid of her body by dumping it in Los Angeles.

On a separate occasion after April of 1996, Sylvia G. was seated in a car with defendant in front of defendant's grandmother's house in Oxnard. She had been driving him around a lot because he did not have a car. She and defendant had an argument because she told defendant that she did not want to be his "taxi" anymore. She then drove defendant to his friend's house, and defendant took the keys from her car so she could not leave. After 10 minutes he returned and she drove back to his grandmother's house. He was calling her names and then got really mad and started "raving." At some point defendant "snapped" and grabbed her by her neck with his left hand. He then pulled her against his knees and put his other hand on her neck and began to choke her. It seemed to her that he was choking her "forever." She could not breathe and thought she was going to die. Eventually, defendant let her go. She had bruises on her neck from the choking that were the size of a finger. Defendant then spoke to her about choking, and told her he knew where the veins were to cut off the air supply.

On another occasion, in June of 1996, defendant and Sylvia G. had another argument when she told him that she did not want to move in with him. Defendant "freaked out" and started calling her names and told her to sit on the floor in the kitchen next to the refrigerator. Defendant then approached her and placed one hand around her neck and picked her up by her neck and lifted her off the ground. He held her by the neck with her feet above the ground for more than a minute. She was unable to breathe and could not scream. Defendant held her by her neck with only one hand for the entire time. As a result of the choking, she had bruises on her neck.

After defendant stopped choking her and set her back down on the kitchen floor, defendant made her stay awake all night. When she tried to go to the bedroom he told her she could stand in a corner. After she stood for a while

---

[5]Gloria De La Cruz was murdered and her body discovered on April 23, 1996.

she tried to move to another room but defendant followed her and would not let her sit down or get comfortable. When she tried to lie down he pulled her up. He let her sit but when she put her head down and tried to sleep he would blow smoke in her face to prevent her from sleeping. He made her stay awake all night. She started to cry, but he told her to "shut up." At 7:00 a.m. the next morning, defendant told her she could not go to sleep until she had sex with him. She did not want to have sex with him, but after another hour she said "Yes" because she could not stay up any longer.

Gloria Morales previously dated defendant and is the mother of defendant's son, who was one year and one month old in April of 1996. She lived with defendant in his grandmother's house in Oxnard. She stopped living with him following a violent incident with defendant that occurred on January 7, 1996. Defendant pulled her hair and she asked him what was wrong. He told her to "shut up" and then got angry. She sat down on the couch next to her son, who was in a playpen, and defendant started yelling. At some point, Ms. Morales found herself holding her son while flat on her back with defendant choking her. Defendant hit her on the head while she was holding her son, and then put his hands on her throat and choked her so she could not breathe for 30 seconds. Defendant placed both of his thumbs on the front of her neck and the only place she felt pressure was from his thumbs. She blacked out and her eyes rolled back. Eventually, defendant released her. She left the next day with her son and never came back.

Rita R. was defendant's stepmother. On January 30, 1987, she was living in Ventura County with defendant's father, who was her husband. Defendant was also living with them. She was walking by defendant's bedroom when defendant asked her if she wanted one of his sweatshirts that had shrunk and was too small for him. She stepped into defendant's room, and defendant then pulled or shoved her all the way into his room. Defendant told her to take her clothes off, but she refused. A struggle ensued for about three minutes until she was too weak to resist and agreed to take off her clothes. Defendant then raped her. When she screamed, defendant muffled her screams with a pillow. In her trial testimony, Rita R. said she could not remember talking to a police officer at a hospital and could not remember talking to another police officer at a police station. She denied that defendant got angry and choked her until she blacked out. She denied that defendant threatened to kill her. Rachele Ford testified that on January 30, 1987, she was a Ventura County deputy sheriff. She went to a hospital in response to a call and met Rita R., who told her that defendant had choked her to the point that she "passed out." Rita R. also told Deputy Ford that defendant said three times that he was going to kill her. Susan Creede testified that in 1987 she was a detective for the Ventura County Sheriff's Department assigned to

work on sexual assaults. She spoke to Rita R. about the sexual assault on a couple of occasions. Rita R. told her that defendant strangled her to the point of unconsciousness. Rita R. also told Deputy Creede that defendant said he was going to kill her, while he was raping and choking her.

Defendant called a number of witnesses in an effort to show that the discolored area near Gloria's genitalia had no bleeding, was not technically a bruise, and could have been caused by treatment for genital warts; that Dr. Fuller, a gynecologist, found no evidence of rape, although he could not rule out that a rape had occurred; that sperm can remain in the vaginal cavity for up to 10 days, although a bath would affect such a possibility; that the bruises on Gloria's lower legs were not typical in a sexual assault case; that Gloria had been reported missing before, had used cocaine, had gone to a residential drug treatment program in the past, and had traded sex for drugs; that the yellow rope was not obtained by defendant's father until October of 1996; and that none of the hairs removed from Gloria's clothing or from the yellow rope that bound her body belonged to defendant.

### III. DISCUSSION

A.-E.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### F.   The Admissibility of Defendant's Statement to Sylvia G. Made in Oxnard Only Days After the Murder That If He Wanted to Get Rid of Her Body He Would Dump It in Los Angeles

Defendant contends that the trial court erred when it allowed testimony from Sylvia G. that defendant had stated to her in a car in Oxnard that if something ever happened to her he would get rid of her body by dumping it in Los Angeles. The statement occurred approximately five days after the murder of Gloria De La Cruz, who was from Oxnard and whose body was "dumped" in a Dumpster in Los Angeles. The court ruled that the statement was admissible as an admission under Evidence Code section 1220, which provides that a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party. Defendant contends that the statement was part of a threat and constituted criminal misconduct, and therefore could only be admitted if it also met the "unique signature" standard required when evidence of other crimes is offered to prove identity under Evidence Code section 1101, subdivision (b).

---

*See footnote, *ante*, page 434.

We find that the law does not require an admission relevant to a completed crime that is made in part in the form of a threat, to be independently admissible as proof of identity under Evidence Code section 1101, subdivision (b), in order to qualify for use at trial. ██ Evidence Code section 1101, subdivision (b) deals with evidence of a crime or other act that is relevant to prove a fact such as motive, opportunity, intent or identity. In order to prove identity, the act must contain distinctive characteristics that are so unusual as to be like a signature. (*People v. Balcom* (1994) 7 Cal.4th 414, 424-425 [27 Cal.Rptr.2d 666, 867 P.2d 777].) Admissions that tend to prove the declarant committed a charged offense, however, are not offered as other crimes evidence, and instead are offered simply as statements made by a defendant that in and of themselves tend to prove he committed a charged offense. Such statements are admissible to prove identity of the perpetrator regardless of whether they demonstrate "distinctive characteristics" akin to a signature. The circumstances under which the admission was made are also admissible to place the statement in context, and a limiting instruction regarding the surrounding circumstances may be appropriate depending on the particular circumstances, but the statement itself is admissible simply because it is an admission, subject to the exercise of discretion under Evidence Code section 352.

██ Here, the relevance of the evidence was not the fact that defendant made a threat, or engaged in an uncharged criminal act that shared "distinctive characteristics" with the charged offense. Rather, the significance was that in making the statement only days after the murder, he specifically mentioned taking a body of a woman from Oxnard to Los Angeles in order to dump the body in an effort to "get rid of it." The statement was being offered as consciousness of guilt and to prove circumstantially that he had recently dumped the body of another Oxnard woman in Los Angeles in an attempt to get rid of the body. The fact that defendant had the circumstances of the murder on his mind only days after committing it, and could not keep himself from talking about the scenario of dumping a woman's body in Los Angeles, is highly relevant and can certainly be viewed as an indirect "acknowledgment" of the crime. We conclude that such a statement is admissible as an admission and does not have to also meet the standard for admissibility of evidence of uncharged acts used to prove identity under Evidence Code section 1101, subdivision (b).

Defendant relies upon *People v. Von Villas* (1992) 10 Cal.App.4th 201, 263 [13 Cal.Rptr.2d 62], in which the court found certain statements constituted admissions "pertaining to" uncharged crimes, and then analyzed the admissibility of the other crimes evidence to prove intent under Evidence Code section 1101, subdivision (b). The court in *Von Villas*, however, did

not address the issue presented here, which deals with the contention that admissions used to prove identity that are made while committing an uncharged crime must meet the "unique signature" standard of Evidence Code section 1101, subdivision (b). Since *Von Villas* did not consider this issue, it is of no help to defendant. Furthermore, we also question the premise of the analysis in *Von Villas*, which appears to place Evidence Code section 1101, subdivision (b) limitations on the admissibility of admissions made in situations where the surrounding circumstances show an uncharged bad act. We believe the better approach is to allow the judge to use Evidence Code section 352 discretion, and to allow the judge to fashion a limiting instruction to deal with the specific situation.

Defendant also relies on *People v. Karis* (1988) 46 Cal.3d 612, 635-637 [250 Cal.Rptr. 659, 758 P.2d 1189], in which the reviewing court stated that a defendant's statements of future criminal conduct that did not relate to any completed crime or specific future crime might simply be statements offered to prove general propensity to commit criminal acts. The court noted that evidence of uncharged bad acts offered to prove propensity is inadmissible under Evidence Code section 1101, subdivision (b), which specifically prohibits propensity evidence. The court then stated that statements of possible future criminal conduct have a potential for prejudice in suggesting propensity to commit crime, and a trial court must therefore carefully examine such statements to see if they qualify as state-of-mind exceptions to the hearsay rule (Evid. Code, § 1250), as circumstantial evidence that defendant acted in conformity with his stated intent, and whether the probative value outweighs the prejudicial effect. (*People v. Karis, supra,* 46 Cal.3d at p. 636.) The court did not hold that a statement that qualifies as a state of mind exception to the hearsay rule is also subject to the requirements of Evidence Code section 1101, subdivision (b) if it is used circumstantially to prove identity.

The *Karis* court also noted that the People contended the statements were admissible as admissions, but the court expressly declined to reach the issue after finding the statements admissible under the state-of-mind exception. The court did state that an issue existed as to whether a statement made prior to the commission of a crime could be an admission unless a specific crime was contemplated when the statement was made, but declined to reach that issue also. We note that the statement at issue in the case at bar was made shortly after the commission of the murder, and after the body had been "dumped" in Los Angeles.

G., H.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## IV.   DISPOSITION

The judgment is affirmed.

Grignon, Acting P. J., and Godoy Perez, J., concurred.

A petition for a rehearing was denied January 2, 2001, and appellant's petition for review by the Supreme Court was denied March 21, 2001.

---

*See footnote, *ante*, page 434.