Filed 12/17/25  In re I.D. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re I.D., a Person Coming Under the Juvenile Court Law. | H052428<br>(Monterey County<br> Super. Ct. No. 23JV000942) |
| THE PEOPLE,<br><br> Plaintiff and Respondent,<br><br>v.<br><br>I.D.,<br><br> Defendant and Appellant. | |

After a contested jurisdictional hearing, the juvenile court sustained allegations that minor I.D. committed three sexual offenses against a 14-year-old girl.  The court consequently declared I.D. a ward of the court for 24 months and committed him to juvenile hall.

On appeal, I.D. contends there is insufficient evidence to support two of the offenses:  sexual penetration of an intoxicated person (Pen. Code,[1] § 289, subd. (e)) and assault with intent to commit a violation of section 289 (§ 220, subd. (a)(2)).  I.D. further contends his defense counsel rendered

_____

[1] All further unspecified statutory references are to the Penal Code.

constitutionally ineffective assistance by failing to object to a nurse practitioner's testimony about the likely cause of the victim's injuries.

For the reasons explained below, we affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In March 2024, the Monterey County District Attorney filed a second amended juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)) alleging that, on or about November 28, 2023,[2] I.D. committed sexual penetration by a foreign object against Jane Doe, an intoxicated person (§ 289, subd. (e); count 1), assault on Doe, a person under age 18, with the intent to commit rape, sodomy, oral copulation, or any violation of section 264.1, 288, or 289 (§ 220, subd. (a)(2); count 2), and misdemeanor sexual battery of Doe (§ 243.4, subd. (e)(1); count 3).

In June and July 2024, the juvenile court held a contested jurisdictional hearing and found the three charged counts true.

In August 2024, the juvenile court adjudged counts 1 and 2 to be felonies, declared I.D. a ward of the court for 24 months, and ordered him to reside with his parents under the supervision of the probation officer. The court also ordered I.D. to serve 434 days in juvenile hall, with credit for 254 days and the remaining time to be served on the temporary electronic monitoring program.

---

[2] Unless otherwise indicated, all dates were in 2023.

B. *Evidence Presented at the Jurisdictional Hearing*

    1. <u>Prosecution Evidence</u>

In November, I.D. was 17 years old, and Doe was 14. I.D. and Doe had known each other for about five years; I.D.'s sister had had a child with Doe's brother.

On the night of November 27, Doe was at home. Around 10 p.m., Doe's mother (mother) told Doe to go to bed, but Doe said she had some homework to do. Around midnight, Doe went out for a walk because she was "stressed." Doe was wearing red and black pajama pants, black underwear, a shirt, a bra, and a black sweater. She received a text message from I.D. Doe and I.D. agreed to meet at a location (on 12th Street) near Doe's home—a spot at which they had met previously.

When I.D. arrived in his black, four-door car, Doe got in. They conversed and things seemed "regular" to Doe. Doe and I.D. had talked many times before, and Doe trusted I.D. I.D. told Doe that he couldn't stay long because he had to work. I.D. pulled a bottle of tequila out from under the front passenger seat (in which Doe was seated) and offered it to Doe. Doe drank from the bottle, taking more than three swallows (but she could not remember exactly how many). I.D. took "[j]ust one" swallow. Very soon after Doe drank from the bottle, she "felt [her] hand numb." She also felt intoxicated and "not normal." Doe testified that she "can't recall what happened" after that, except for some things that she described as "a little scene."

Doe remembered having a conversation with I.D. about his friend and that I.D.'s face looked "serious." This made Doe feel nervous and afraid. While Doe was inside I.D.'s car, she texted a friend and asked to be picked up. Doe also called that friend thereafter, at 12:34 a.m. on November 28.

According to Doe's phone, the call lasted about two minutes. Later, at 12:51 a.m. and 12:54 a.m., the friend called and texted Doe, asking where she was. Doe did not appear to have answered those calls or responded to the texts.

Doe testified that she recalled I.D. twice "trying to get [her] phone," which made Doe feel "[n]ervous." Doe and I.D. struggled over the phone when Doe tried to take it back. Doe further recalled I.D. "leaning on top of [her]" and telling her that he "made [her] a hickey."[3] Doe remembered trying to push I.D. away and feeling scared. Doe also recalled trying to get out of I.D.'s car and falling. However, Doe did not recall I.D. trying to pull down her pants, trying to put his hands inside her pants, asking her to have sex, or trying to get her in the backseat of his car. Doe additionally remembered her brother finding her in front of their house and calling out to her mother. Doe recalled not having any pants or underwear on at that time (but she was still wearing her sweater).

Mother testified that at 3:00 a.m., she heard noises outside her house. Mother exited the house and saw Doe standing out front. Doe looked like she was "on drugs" or "drunk." Doe's nose was bleeding, and her hands were injured. Doe "did not talk" and "had vomit all over her hair." Mother called 911, but she could not communicate with the dispatcher because of language differences.

Near the sidewalk/driveway area in front of the house, mother found some of Doe's clothing and her phone. According to mother, it looked as though someone "had thrown [Doe's] clothes right there." Doe's pants were

---

[3] On cross-examination, Doe acknowledged that she had never previously kissed or been intimate with I.D. She also said that I.D. had never physically or sexually assaulted her in the past.

"were full of vomit." Doe's underwear was missing and was not subsequently found.

Later that morning, mother found Doe's earbud and a liquor bottle in the gutter a couple of houses away, near the corner of 12th Street.

Around 8:00 or 9:00 a.m., mother took Doe to a hospital emergency room. According to mother, Doe was not feeling good, was not talking, and was crying "a lot." Doe testified that she had suffered scrapes and injuries on her body and recalled feeling soreness in her back, thighs, and "like everywhere." Doe did not have these injuries or pains prior to meeting with I.D. Doe also testified that she vaguely recalled going to the hospital and speaking to police.

Around 10:53 a.m. on November 28, the police received a call from a mandatory reporter at the hospital about Doe's report of a sexual assault. At 11:24 a.m., hospital staff collected a blood sample from Doe. Just after noon, Halleh Entekhabi, a sexual assault response team (SART) pediatric nurse practitioner, began a nearly three and one-half hour examination of Doe.

Entekhabi testified as an expert in the field of child sexual assault. She became a clinical registered nurse in 2011, holds a master's and a doctoral degree in pediatric nurse practitioner primary care, has practiced as a pediatric nurse practitioner since 2020, and is a certified sexual assault nurse examiner specializing in pediatrics. Entekhabi had conducted about 160 SART exams since 2021, including approximately 100 such exams on children.

Entekhabi testified that the objective of a SART exam is not to prove whether a sexual assault occurred. Entekhabi similarly acknowledged that it is not the job of a SART nurse to draw firm conclusions about what in fact happened to a patient. According to Entekhabi, there are specific and

5

nonspecific findings in a SART exam. A specific finding is most likely caused by sexual assault or abuse. A nonspecific finding may or may not be the result of sexual assault or abuse. Entekhabi explained that "[m]ost of the exams are normal," and "[t]he vast majority of the time, the findings are nonspecific." Nevertheless, a professional assessment that a sexual assault likely occurred can be made based on nonspecific findings.

During Entekhabi's SART examination of Doe, Doe named her assailant and did not report having suffered any recent injuries other than those associated with the incident. Doe appeared very disheveled (with vomit in her hair) but not intoxicated. Doe was anxious, tearful, and a little worried about what the exam process would entail. Doe reported that she was experiencing pain in her genital area, elbow, back, legs, and face (where she had an abrasion). Entekhabi did not observe any bits of gravel, concrete, dirt, or twigs embedded in Doe's skin or in her abrasions and lacerations. Entekhabi documented her observations on a standard form and took photographs of Doe (which were admitted into evidence at the jurisdictional hearing).

Entekhabi documented a painful abrasion on Doe's shoulder, an abrasion on Doe's left palm, scattered abrasions on Doe's lower legs and left toes, and an abrasion on the back side of Doe's upper right shoulder. Entekhabi opined that it would be "unlikely" for these injuries to have resulted from Doe falling on a hard surface/sidewalk with pants on and that "[i]t would be more likely if [Doe] wasn't wearing pants," but still unlikely. Entekhabi acknowledged that "we can't say what caused the injury," but she opined that, based on Doe's statements about what happened, Doe's injuries were consistent with sexual assault.

Additionally, Entekhabi documented a suction injury (i.e., a "hickey") above Doe's right breast (which Entekhabi swabbed for later DNA testing). Entekhabi also documented a "very tender" abrasion on Doe's upper right lip ("right underneath her nose") and very small lacerations to Doe's right ring finger. Entekhabi opined that she would not expect the abrasion on Doe's face to have resulted from a fall because there were no other injuries present on Doe's face. Entekhabi testified that after she consulted with her medical director, she concluded that Doe's facial abrasion could "possibly" have been caused by "a hand holding over her mouth" (i.e., "[e]ither her hand or someone else's hand"). Entekhabi also concluded that Doe's finger "lacerations could possibly be bite marks and so it would be someone else biting her finger to remove the hand from her face." Entekhabi further explained that Doe could have used her hand to remove a hand from her face. Entekhabi opined that Doe's finger injuries were consistent with fighting back and it was "very unlikely" they were caused by a "slip and trip."

Regarding Doe's genitalia, Entekhabi documented two areas of erythema (i.e., redness) around Doe's perihymenal tissue and an erythema to Doe's cervix ("right around the cervical os"). Doe reported that these areas were painful.[4] Entekhabi testified that it was not common to see this sort of redness and tenderness during a SART exam. Entekhabi opined that her findings were consistent with penetration and sexual assault. Entekhabi testified that some other possible explanations for the redness and tenderness included "pigmentation in the skin" and Doe's "menstrual cycle, [i.e.,] where she was in that cycle could cause color change and tenderness."

---

[4] After the SART exam, Entekhabi's supervisor reviewed the documentation produced by Entekhabi and reported that she (the supervisor) could not see the erythema that Entekhabi had observed on Doe's cervical os, because the photographs taken during the exam were "blurry."

Entekhabi opined that it is "possible" penetration was a more likely cause of Doe's redness and tenderness, but Entekhabi could not say "how likely it was." Entekhabi added, "but it is possible also considering that [Doe] wasn't on her menstrual" at the time of the exam. Entekhabi further opined, based on the exam and Doe's history, that "[i]t would be unlikely" that no penetration occurred.

Based on her knowledge, training, and experience, Entekhabi concluded that her SART exam findings were consistent with the timeline and history of the events described to her, and it was more likely that sexual assault explains the findings as opposed to the other possible explanations.

On cross-examination, Entekhabi acknowledged that infection, irritation, and rash can cause erythema and that poor hygiene can cause erythema on the perihymenal tissue. Entekhabi also acknowledged that she cannot definitively say Doe was sexually assaulted.

During the police investigation, officers collected and reviewed video footage recorded by a city-operated camera located on 12th Street. According to Greenfield Police Officer Maria Martinez, the footage showed that around 12:04 a.m. on November 28, a black sedan drove up and parked on 12th Street (around the corner from Doe's house). A person got into the car. Approximately 41 minutes and 42 seconds later, a person exited the driver's seat, and another person exited the passenger's seat. As one of the individuals tried to walk away, the other person appeared to try to prevent that from happening. As the individual again tried to walk away, the other person brought them back to the car. The car started up and drove away, turning right onto Doe's street.[5]

---

[5] Officer Martinez acknowledged that the clarity of the video footage was "minimal" because of the distance between the camera and the car and

Video footage recorded by a private camera located next door to Doe's house similarly showed that around 12:51 a.m., a car turned onto Doe's street and turned off its lights. Around three minutes later, an individual appeared in the driveway of Doe's home. Shortly thereafter, the car drove away. Officer Martinez testified that she reviewed additional video footage from this camera (recorded from 12:00 a.m. to 3:00 a.m.), but she did not observe anything else relevant to the investigation.

California Department of Justice (DOJ) senior criminalist Josh Sehhat conducted a DNA analysis on some of the sexual assault kit swabs collected from Doe during the SART exam. Sehhat did not find any male DNA in the vaginal or cervical swabs taken from Doe. Sehhat explained that the failure to detect male DNA in vaginal and cervical swabs does not preclude the possibility that either digital penetration or penetration with a foreign object occurred. Sehhat found three DNA contributors in the swab taken from Doe's right breast. Sehhat's analysis of this DNA mixture revealed that approximately 77 percent of the DNA came from Doe, 22 percent of the DNA came from I.D., and 1 percent of the DNA (a partial profile, which could have been present due to accidental contamination) came from a third, unidentified contributor. Sehhat concluded that the DNA analysis "provides very strong support that [I.D.] is a contributor to the DNA mixture" detected on the swab of Doe's right breast.

DOJ latent print examiner Corey Schroeder found I.D.'s fingerprint on the liquor bottle that Doe's family turned over to the police.

---

the fact that it was nighttime. Martinez also acknowledged that it was difficult to see any details of the people in the footage and there was a "possibility" "that somebody was helping somebody who was drunk and stumbling down the street."

A DOJ forensic laboratory analyzed Doe's blood sample for the presence of alcohol and certain specified drugs (i.e., amphetamine, cocaine, opiates, benzodiazepines, fentanyl, oxycodone, buprenorphine, methadone, zolpidem, carisoprodol, methamphetamine, and tetrahydrocannabinols).[6] The DOJ's report stated that there was no detectable ethyl alcohol or drug in Doe's blood sample.

At some point after the incident, Doe received a text message and a call about I.D. A person told Doe that she should "pray for [I.D.] to come out [of juvenile hall] or everyone would be against [Doe] and that things will start to happen." In addition, someone asked Doe why she had not visited I.D. at juvenile hall and offered to take her to see him. These communications "worried" Doe. Doe testified further that she had been receiving therapy since the incident. Mother testified that Doe has "never been the same" after the incident. She "doesn't talk much" anymore, "screams a lot at night," and "doesn't sleep well."

2. Defense Evidence

I.D. presented the testimony of one witness, Rachel Countryman, a forensic nurse consultant and registered nurse with a specialty in sexual assault, strangulation, and intimate partner violence. Countryman testified as an expert in sexual assault and SART exams. Countryman had conducted approximately 83 SART exams over her career, including some on persons under age 18.

Countryman testified that the purpose of a SART exam is first to provide medical care to the patient and, secondly, to collect swabs and document any findings observed during the exam. Countryman explained

_____

[6] The list does not include GHB, a fast-acting drug commonly referred to as a "date rape drug."

10

that the "main thing is to be nonbiased. [A SART examiner is] there to assess, triage, and then treat however that patient would like to be treated." Countryman also explained the importance of a detailed SART report that documents all the exam's findings. Countryman said that including some findings but not others because the examiner "thought maybe [the excluded findings] weren't applicable to a sexual assault . . . might be getting into a bias-type area."

In preparation for her testimony, Countryman reviewed the police reports, Doe's SART exam records (including Entekhabi's report and the photographs taken during the exam), Doe's emergency room records, some subsequent follow-up medical records, and Entekhabi's direct examination testimony.

Countryman testified that it was hard to see "any abraded skin" in the photographs of Doe's right shoulder and left palm. She further noted that the photograph corresponding to Doe's reported lower back pain does not reflect any injury in that area. Countryman stated that the abrasion under Doe's nose could have been caused by any blunt object that scraped across her skin. Countryman opined that the bodily injuries described by Entekhabi are "pretty minimal" and could have resulted from Doe falling. Countryman further opined that it is "pretty common" for a person who was "blackout drunk" to wake up with minor injuries, aches, and pains, and that lower back pain could result from passing out "in an unnatural position" for an hour or two.

Regarding Entekhabi's examination of Doe's genitals, Countryman testified that erythema "can happen in a lot of situations," including from increased blood flow to an area, irritation, inflammation, and infection. Poor hygiene also can result in redness to the vulva area. Countryman testified

11

that she did not see erythema on Doe's cervix, and any slight erythema that was not captured in the SART exam photos could be "a normal variant."[7]

Countryman acknowledged seeing erythema in the photos of Doe's perihymenal tissue. Countryman explained that the erythema "wasn't really . . . on the hymenal ring, which would be the opening of . . . the vagina, but it was more in those what we call 'hymenal bands,'" which "run into . . . the 'vestibule' or into the labia minora." Countryman stated that she could not draw any conclusions about that erythema and opined that it could be a natural occurrence resulting from something other than sexual assault. Countryman also stated that the SART report did not note any tenderness associated with Doe's genital erythema.

Countryman testified that she cannot conclude, and no other medical expert could conclude, based on the SART exam alone that Doe was sexually assaulted. Countryman also said that she cannot conclude any sexual activity occurred from the exam itself.

## II. DISCUSSION

A. *Sufficiency of Evidence on Counts 1 and 2*

I.D. contends there is insufficient evidence to prove under count 1 that sexual penetration occurred, and because the intent element for count 2 relied on I.D.'s alleged commission of sexual penetration, there is insufficient evidence to sustain count 2.

1. <u>Legal Principles</u>

" 'The standard of proof in juvenile proceedings involving criminal acts is the same as the standard in adult criminal trials.' " (*In re Cesar V.* (2011) 192 Cal.App.4th 989, 994; see also *People v. Trujeque* (2015) 61 Cal.4th 227,

---

[7] Countryman defined a "normal variant" as "findings that we can see during a sexual assault exam that could be not related to a sex assault."

247; Welf. & Inst. Code, § 701.) In a juvenile appeal, courts apply the same appellate standard of review as that used when an adult defendant challenges the sufficiency of the evidence to support a conviction. (*Cesar V.*, at pp. 994–995; see also *In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1371– 1373.)

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944.) "In applying this test, we . . . presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "We 'must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' " (*Ibid.*) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [trier of fact]'s verdict." (*Ibid.*) "However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360; see also *People v. Ware* (2022) 14 Cal.5th 151, 167–168.)

To sustain count 1, the prosecution had to prove beyond a reasonable doubt that: (1) I.D. committed an act of sexual penetration with Doe; (2) the

penetration was accomplished by using a foreign object, substance, instrument, device, or unknown object; (3) the effect of an intoxicating substance prevented Doe from resisting the act; and (4) I.D. knew or reasonably should have known that the effect of that substance prevented Doe from resisting the act.  (§ 289, subd. (e); CALCRIM No. 1047.)

Section 289 defines " '[s]exual penetration' " as "the act of causing the penetration, however slight, of the genital or anal opening of any person . . . for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."  (*Id.*, subd. (k)(1).)  Penetrating the labia constitutes sexual penetration within the meaning of section 289.  (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1371 ["contact with the hymen as well as the clitoris and the other genitalia inside the exterior of the labia majora constitutes 'sexual penetration' "].)  "Penetration may be proved by circumstantial evidence."  (*People v. Stevenson* (1969) 275 Cal.App.2d 645, 650.)

Regarding count 2, section 220, subdivision (a)(2) provides in pertinent part that "any person who assaults another person under 18 years of age with the intent to commit rape, sodomy, oral copulation, or any violation of [s]ection 264.1, 288, or 289 shall be punished by imprisonment."

To sustain count 2, the prosecution had to prove beyond a reasonable doubt that:  (1) Doe was under age 18; (2) I.D. did an act that by its nature would directly and probably result in the application of force to a person; (3) I.D. did that act willfully; (4) when I.D. acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; (5) when I.D. acted, he had the present ability to apply force to a person; (6) when I.D. acted, he intended to commit sexual penetration in violation of section 289,

14

subdivision (e).[8]  (See § 220, subd. (a)(2); see also *People v. Maury* (2003) 30 Cal.4th 342, 399–400; *People v. Leal* (2009) 180 Cal.App.4th 782, 791; § 240; CALCRIM Nos. 890 & 915.)

    2. <u>Analysis</u>

Substantial evidence supports all the elements of section 289, subdivision (e), including that I.D. committed an act of sexual penetration.

Doe testified that on the night of November 27–28, she did not have any injuries or pain in her body before she met with I.D.  Nurse practitioner Entekhabi likewise testified that Doe did not report any recent injuries other than those associated with the present incident.  Doe further testified that while she was inside I.D.'s car that night, she felt intoxicated shortly after drinking from the liquor bottle I.D. gave her.  Doe also recalled I.D. leaning on top of her and saying he gave her a "hickey," and that she tried to push I.D. away, felt scared, and tried to get out of his car.

Entekhabi testified about the erythema that was present on Doe's perihymenal tissue and cervix just hours after Doe had been in the car with I.D.  The prosecution further admitted into evidence photographs that Entekhabi took documenting her observations of the erythema.  Entekhabi opined that Doe's erythema appeared to be a condition that was "from the same time frame and consistent with the history of the events that occurred the night before."  (Boldface omitted.)

Although the SART report itself does not reflect any statement by Doe about tenderness or pain connected with the documented erythema, Entekhabi testified that Doe reported having genital pain generally and

---

[8] In written proposed findings and argument to the juvenile court, the prosecutor described the elements of count 2 as including an intent to commit the "underlying crime," i.e., a violation of section 289, subdivision (e).

tenderness/pain specifically associated with the areas of erythema that Entekhabi observed on Doe's perihymenal tissue and cervix. In addition, Entekhabi testified that her findings were consistent with penetration and sexual assault, and she concluded that it was more likely that sexual penetration explains those finding than any other possible alternative explanation.

Notwithstanding Entekhabi's failure to document the tenderness and pain, when the juvenile court rendered its decision on the charges, the court said it found Entekhabi "very credible." The court noted that Entekhabi had testified numerous times that "that there was reported tenderness in both the peri-hymenal area and the cervix."

We must accept the trial court's findings on Entekhabi's credibility. " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)

I.D. asserts that "[t]he evidence in this case does not establish what happened in the two hours between the time that [I.D.] dropped Doe off at her house and when her family found her." Relatedly, I.D. claims "there is no evidence connecting the removal of Doe's pants and underwear to [I.D.]'s conduct, and the only reasonable inference based on the evidence is that Doe's pants were removed at some point while she was outside of her home."

I.D.'s contentions are not persuasive. Mother and the police searched for but did not find Doe's underwear outside her house or in the surrounding neighborhood. The neighbor's camera recorded activity occurring in the area

16

where Doe fell, and Officer Martinez testified that she viewed the camera's footage from the time Doe fell until she was found and did not discover anything relevant to the investigation. In addition, mother testified that it looked as though someone "had thrown [Doe's] clothes right there" on the ground in front of the house. These facts support a reasonable inference that an intoxicated and half-naked Doe exited I.D.'s car while holding her pants and phone (but not her underwear), dropped her belongings, and fell to the ground in the sidewalk/driveway area of her home.

Given all the evidence, viewed in the light most favorable to the judgment, we conclude there is substantial evidence upon which the juvenile court could find, beyond a reasonable doubt, that I.D. committed sexual penetration by a foreign object against an intoxicated Doe as alleged in count 1. (See *People v. Holt* (1997) 15 Cal.4th 619, 669 ["The jury verdict in this case was not, as defendant argues, based only on speculation. It was based on evidence that the redness present in the victim's vagina was consistent with penetration by an adult male penis. The inference that defendant accomplished penetration, apparently drawn by the jury on the basis of this evidence and defendant's admission that he sexually assaulted the victim, is reasonable."]; see also *People v. Earp* (1999) 20 Cal.4th 826, 888 ["Vaginal redness consistent with penetration by an adult penis constitutes evidence sufficient to establish rape."].)

Regarding count 2, I.D. argues that "[t]he lack of substantial evidence proving that [I.D.] committed the offense of sexual penetration compels reversal on count 2 as well," and "there is no other evidence suggesting [I.D.] assaulted Doe with the requisite intent." Because we have concluded that substantial evidence supports the juvenile court's finding regarding sexual penetration against an intoxicated Doe for count 1, and I.D. makes no other

17

argument challenging the sufficiency of the evidence on count 2, we decide there is substantial evidence that I.D. intended to commit the underlying sexual penetration (§ 289, subd. (e)) when he assaulted Doe. Accordingly, we uphold the juvenile court's decision to sustain count 2.

B. *Ineffective Assistance of Counsel*

I.D. contends that his defense counsel rendered constitutionally ineffective assistance by failing to object to nurse practitioner "Entekhabi's improper opinion testimony regarding the genesis of Doe's apparent injuries and her conclusion that sexual assault likely occurred." (Boldface & capitalization omitted.)

1. Legal Principles

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id*., § 801).' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044.) An expert's opinion is admissible if it relates "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Expert opinion testimony is not objectionable simply "because it embraces the ultimate issue to be decided by the trier of fact" (*id*., § 805), but " ' "[a] witness may not express an opinion on a defendant's guilt." ' " (*People v. Leonard* (2014) 228 Cal.App.4th 465, 493, quoting *Vang*, at p. 1048.)

" '[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony.' [Citation.] 'Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications.' [Citation.] [¶] 'The trial court's determination of whether a witness qualifies as an expert is a matter of

18

discretion.' " (*People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1079 (*Tuggle*).) " ' " ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility.' " ' " (*Id.* at pp. 1079–1080.)

An "attorney's failure to object . . . to seriously damaging, inadmissible evidence which played a major role in the verdict of guilt" may signify constitutionally ineffective assistance. (*People v. Sundlee* (1977) 70 Cal.App.3d 477, 485.) However, a "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772.) " 'Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight. . .. A reviewing court will not second-guess trial counsel's reasonable tactical decisions.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.)

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687.) We can reject the claim on either element of the standard. (*Strickland*, at p. 687; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"Representation does not become deficient for failing to make meritless objections." (*People v. Ochoa* (1998) 19 Cal.4th 353, 463; see also *People v.*

19

*Bradley* (2012) 208 Cal.App.4th 64, 90.)  Likewise, "[c]ounsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

2. Analysis

I.D. asserts that Entekhabi's background suggests she "is qualified to testify about the appearance of a physical injury" but not "how a particular injury may have been caused."  I.D. further asserts that his defense counsel should have objected to Entekhabi's testimony that (1) the abrasion on Doe's upper lip and the small lacerations on Doe's finger "appeared to suggest Doe was fighting back," (2) the genital findings "were most likely caused by penetration," and (3) "the totality of Doe's injuries were probably the result of a sexual assault."  I.D. argues that "[t]his testimony went beyond the scope of the witness's expertise, and usurped the court's role as the factfinder."

We cannot say, on the instant record, that there is no satisfactory explanation for defense counsel's failure to object to the expert testimony that I.D. specifies in this appeal.  As detailed *ante* (pt. I.B.1.), Entekhabi holds a doctoral degree in pediatric nurse practitioner primary care, is a certified sexual assault nurse examiner specializing in pediatrics, and had previously

20

conducted around 160 SART exams, including approximately 100 such exams on children.  The trial court found Entekhabi to be "an expert in the field of child sexual assault."  I.D. did not challenge Entekhabi's qualifications as such an expert at the jurisdictional hearing, and I.D. makes no argument on appeal that defense counsel should have objected to the juvenile court's determination of Entekhabi's expertise.

A SART exam includes an interview of the complainant regarding the history of assault and a physical examination by a qualified health care professional (see §§ 13823.5, 13823.7, 13823.93), and a "major purpose" of the exam is to determine if the physical findings are consistent with the history related.  (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1479; see also § 13823.93, subd. (a) [a SART exam is meant to "evaluate, collect, preserve, and document evidence, *interpret findings*, and document examination results" (italics added)].)  Moreover, long-standing precedent affirms that an expert medical witness may opine on the cause of a particular injury based on "the expert's deduction from the appearance of the injury itself."  (*People v. Bledsoe* (1984) 36 Cal.3d 236, 249; see also *People v. Catlin* (2001) 26 Cal.4th 81, 131 ["Qualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion."].)  In the same vein, one Court of Appeal observed decades ago that "the diagnosis of sexual abuse . . . from the observation of certain marks or scarring is nothing new."  (*People v. Mendibles* (1988) 199 Cal.App.3d 1277, 1295 (*Mendibles*), disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12.)  "Such a diagnosis need not be based on certainty, but may be based on probability; the lack of absolute scientific certainty does not deprive the opinion of evidentiary value." (*Mendibles*, at p. 1293.)

21

Given Entekhabi's extensive education, certifications, and experience in pediatrics and sexual assault examinations, and based on relevant statutes and precedent concerning the permissible scope of medical expert testimony, defense counsel could reasonably have decided that Entekhabi was sufficiently qualified to opine on the potential causes of Doe's injuries. (See *People v. Sta Ana* (2021) 73 Cal.App.5th 44, 59.)

Furthermore, during her expert testimony, Entekhabi explained the bases for her opinions about the way Doe may have sustained the abrasion on her lip, the lacerations on her finger, and the erythema and tenderness on her perihymenal tissue and cervix. A survey of case law shows that Entekhabi's expert testimony is akin to that presented in other cases. (See, e.g., *People v. Taylor* (2010) 48 Cal.4th 574, 588 [noting that a SART nurse testified the victim's "injuries more typically occur in a rape involving use of a foreign object like a knife"]; *People v. Robinson* (2000) 85 Cal.App.4th 434, 440 [noting that in a doctor's expert opinion, "the bruises on the [victim's] legs and vulva were significant indicia of sexual assault. The bruises on the vulva were consistent with forcible rape"]; *People v. Stanley* (1984) 36 Cal.3d 253, 256 [noting that a doctor testified her "examination revealed rectal abrasions, which in the doctor's opinion indicated that [the victim] had had rectal intercourse without a lubricant"].)

That Entekhabi's opinions involved subjective determinations does not render her testimony beyond the scope of her expertise or otherwise inadmissible. (See *Mendibles*, *supra*, 199 Cal.App.3d at p. 1293.) As our Supreme Court has observed, "opinion testimony often includes a subjective component, and good faith disagreements among credible experts are commonplace." (*In re Richards* (2012) 55 Cal.4th 948, 964.) Any question about the degree of Entekhabi's knowledge and the soundness of her

conclusions goes more to the weight of the evidence than its admissibility. (See *Mendibles*, at p. 1293; *Tuggle*, *supra*, 203 Cal.App.4th at p. 1080.)

Under the present circumstances, if defense counsel had objected to Entekhabi's testimony regarding the genesis of Doe's lip abrasion, finger lacerations, and genital erythema as improper expert opinion, that objection would likely have been futile. (See *People v. Rowland* (1992) 4 Cal.4th 238, 267 [rejecting a challenge to "expert medical opinion that the absence of genital trauma is not inconsistent with nonconsensual sexual intercourse"]; *People v. Newlun* (1991) 227 Cal.App.3d 1590, 1602 ["Given that expert medical testimony about the physical characteristics of an injury is generally competent to prove the cause of the injury [citation], it would be anomalous if a reviewing court could not consider such testimony as substantial evidence of molestation."].) Likewise, defense counsel could have reasonably decided that any objection to Entekhabi's ultimate conclusion about her SART exam findings and the potential of a sexual assault on Doe would been unsuccessful. (*Ibid.*)

For these reasons, we cannot conclude there simply could be no satisfactory explanation for defense counsel's failure to object to Entekhabi's expert testimony. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) We decide I.D. has not demonstrated he received constitutionally ineffective assistance of counsel.

## III. DISPOSITION

The judgment is affirmed.

_____
Danner, J.

WE CONCUR:



_____
Greenwood, P. J.



_____
Bromberg, J.

**H052428**
***People v. I.D.***